**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROBERT STEWART, REBECCA HOWARD and PHILIP MCCALL, for themselves and all others similarly situated,** ) ) ) ) ) | **Case No. _____** |
| **Plaintiffs,** ) | |
| **v.** ) ) | **JURY TRIAL DEMANDED** |
| **FIRST STUDENT, INC.,** ) **Defendant.** ) ) | |

## COLLECTIVE AND CLASS ACTION COMPLAINT

Robert Stewart, Rebecca Howard and Philip McCall ("Plaintiffs"), by and through their undersigned attorneys, hereby make the following allegations against First Student, Inc. ("Defendant") concerning their acts and status upon actual knowledge and concerning all other matters upon information, belief and the investigation of their counsel:

## NATURE OF THE ACTION

1.      Defendant's business includes providing CDL-licensed Drivers to perform both school bus and charter transportation services.  Plaintiffs, former First Student Drivers, bring this action for violations of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), and the state wage laws of Pennsylvania, Ohio and New Jersey, challenging common work assignment, timekeeping and compensation policies and practices that cause Defendants' Drivers to be denied both regular and overtime wage payments due for work they performed with Defendant's knowledge and for Defendant's benefit.

2.      Plaintiffs bring this action to redress Defendants' company-wide violations of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), on a collective basis

pursuant to 29 U.S.C. § 216(b) for all people who have worked as First Student Drivers in any location nationwide during the maximum limitations period (the "FLSA collective").

3.      Plaintiff Stewart brings this action to redress Defendants' violations of the Pennsylvania Minimum Wage Act of 1968, 43 P.S. §§ 333.101, *et seq.* ("PMWA"), and the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 *et seq.* ("PWPCL"), under Fed. R. Civ. P. 23 for all people who have worked as a First Student Driver in Pennsylvania since May 31, 2017 (the "Pennsylvania Class").

4.      Plaintiff Howard brings this action to redress Defendants' violations of the Ohio Minimum Fair Wage Standards Act, O.R.C. § 4111.01 *et seq.* ("OMFWSA"), and the Ohio Prompt Pay Act, O.R.C. §§ 4113.15 *et seq.* ("OPPA"), under Fed. R. Civ. P. 23 for all people who have worked as a First Student Driver in Ohio since May 31, 2018 (the "Ohio Class").

5.      Plaintiff McCall brings this action to redress Defendants' violations of New Jersey Wage and Hour Law, N.J. Stat. Ann. §§ 34:11-56a *et seq.* and N.J.A.C. 12:56-5.1 *et seq.* ("NJWHL"), and the New Jersey Wage Payment Law, N.J.S.A. §§ 34:11-4.1 *et seq.* ("NJWPL"), under Fed. R. Civ. P. 23 for all people who worked as a First Student Driver in New Jersey since May 31, 2014 (the "New Jersey Class").

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over Plaintiffs' FLSA claim pursuant to 29 U.S.C. §216(b) and 28 U.S.C. §§ 1331.

7.      This Court has supplemental jurisdiction over Plaintiffs' Pennsylvania, Ohio and New Jersey state-law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## THE PARTIES

9.      Plaintiff Stewart is an adult citizen of Pennsylvania who resides in Philadelphia County.  Mr. Stewart worked as a full-time, hourly First Student Bus and Charter Driver in Philadelphia, PA from 2018 to March 2020.  Mr. Stewart is personally familiar with, and has been personally affected by, the policies and practices described in this Complaint and has signed and filed a Consent Form to join this litigation.  *See* Stewart Consent Form (Exhibit A).

10.     Plaintiff Howard is an adult citizen of Ohio who resides in Lorain County.  Ms. Howard worked as a full-time, hourly First Student Bus and Charter Driver in Lorain, OH from March 2019 to March 2020.  Mr. Stewart is personally familiar with, and has been personally affected by, the policies and practices described in this Complaint and has signed and filed a Consent Form to join this litigation.  *See* Howard Consent Form (Exhibit B).

11.     Plaintiff McCall is an adult citizen of New Jersey who resides in Mercer County. Mr. McCall worked as a full-time, hourly First Student Bus and Charter Driver in both Hamilton Township, N.J. and Burlington Township, N.J. from mid-2008 to late 2017.  Mr. McCall is personally familiar with, and has been personally affected by, the policies and practices described in this Complaint and has signed and filed a Consent Form to join this litigation.  *See* McCall Consent Form (Exhibit C).

12.     Defendant First Student, Inc. ("First Student") is a Florida Foreign For-Profit Corporation based in Cincinnati, Ohio.  *See https://firststudentinc.com/about-us/* (accessed May 7,2020); *http://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype= EntityName&directionType=Initial&searchNameOrder=FIRSTSTUDENT%20P027831&aggre gateId=forp-p02783-ca13f27f-e8ba-483d-9501-11567749ac94&searchTerm=first%20student% 2C%20inc&listNameOrder=FIRSTSTUDENT%20J582651* (accessed May 7, 2020).  First

Student is "the largest provider of home-to-school student transportation in North America," operating "in 460 locations across the US and Canada," and employing "48,000 people." *See https://www.firstgroupplc.com/* (accessed May 7, 2020); *https://www.firstgroupplc.com/ about-firstgroup/first-student.aspx* (accessed May 7, 2020).

13.     Throughout the relevant period, First Student has owned and exercised operational control over all significant business functions relating to its Drivers, including: setting and implementing the compensation, hours of work, overtime, scheduling and timekeeping policies and practices at issue in this matter, providing training on these policies and practices, scheduling their school bus and charter work, tracking their work time and setting and paying their wages.

## BACKGROUND FACTS

14.     First Student Drivers provide school bus services that involve transporting children from home to school and back each weekday from early September to mid-June.

15.     First Student Drivers also provide charter services that involve transporting groups of people to events, field trips, or meetings on weekends and weekdays all year long.

16.     Defendant maintains common work, compensation, hours of work, overtime, scheduling and timekeeping policies and practices for all of the school bus and charter work its Drivers perform nationwide.  *See* First Student National Employee Handbook (Exhibit D).

17.      Defendant's common, nationwide policies:

   a.   Require all school bus and charter Drivers to perform all necessary safety checks and risk assess [their] work area and job before [they] do any work, *id.* at p. 4;

   b.   Require all school bus and charter Drivers to "keep [their] work area clean and tidy at all times," *id.*;

   c.   Require all school bus and charter Drivers to "properly care for all equipment," *id.* at p. 9;

   d.   Require all school bus and charter Drivers to "meet or exceed

job standards and customer requirements," *id.*;

e.  Require all school bus and charter Drivers to "report and record all hours you work for the date you performed the work," by the end of their next scheduled shift, *id.* at pp. 25, 30;

f.  Prohibit all school bus and charter Drivers from "editing their time records for any purpose" other than to "correct a mistake," *id.* at p. 26;

g.  Prohibit First Student employees from instructing or encouraging school bus and charter Drivers from working "off the clock," but not prohibiting school bus and charter Drivers from working "off the clock." *id.*;

h.  Promise that "nonexempt employees will be paid overtime where required by… law," but requiring all school bus and charter Drivers to be "authorized in advance" by their supervisor for "all overtime work," *id.* at p. 27;

i.  Require all school bus and charter Drivers to "participate in [charter and field trips] when requested by local management, *id.*;

j.  Require all school bus and charter Drivers to "arrive to work regularly and on time for each scheduled workday," because "even one excused [] tardiness may be considered excessive," *id* at pp. 35-36; and

k.  Impose a threat of "disciplinary action, up to and including termination of employment" on all school bus and charter Drivers for any violations of these policies, *id.* at pp. 26, 50-53.

### Failure to Capture Drivers' Actual Work Time

18.  During the school year, First Student Drivers are typically assigned a split-shift schedule that centers around a morning school bus run (picking children up at home and dropping them off at school) and an afternoon school bus run (picking children up at school and dropping them off at home) separated by a break.  As described below, Defendant's common policies and practices cause Drivers working a split-shift schedule to record far less time for payroll purposes than they actually work, meaning they are paid nothing for many straight-time and overtime work hours each week.

19.     During the school year, to comply with Defendant's policies and avoid discipline, Plaintiffs arrived at their work location for their morning school bus run and followed established practices that required them to: park their car in the parking lot, walk to the Dispatch Office, wait in line with other Drivers, receive their bus keys and manifest from the Dispatcher, walk back to the lot, find their assigned bus, open and start their bus, remove the Zonar Systems Fleet Management tracking device ("Zonar") from its storage sleeve, turn on the Zonar, wait for the Zonar to load and use the Zonar Logs function to clock-in.  Following this procedure caused Plaintiffs to arrive for their morning school bus run and begin working 20-30 minutes before they clocked-in each day.

20.     Defendants easily could have avoided or minimized this morning school bus run timekeeping error by requiring Plaintiffs to clock-in upon arriving in the parking lot or upon entering the building, or by allowing Plaintiffs to enter their actual morning arrival time in the Zonar system.

21.     During the school year, to comply with Defendant's policies and avoid discipline, Plaintiffs completed their morning school bus run and followed established practices that required them to: return their bus to their work location, park their bus in the parking lot, clock-out using the Zonar Logs function, power down the Zonar and return it to the storage sleeve, perform a post-trip inspection of their bus, clean and sweep their bus, walk to the Dispatch Office, wait in line with other Drivers, return their bus keys to the Dispatcher and walk back to their vehicle in the parking lot to start their mid-shift break.  Following this procedure caused Plaintiffs to clock-out 20-60 minutes before finishing the work associated with their morning school bus run each day.

22.     Defendants easily could have avoided or minimized this morning school bus run timekeeping error by requiring Plaintiffs to clock-out upon leaving the building or upon leaving

the parking lot, or by allowing Plaintiffs to enter their actual morning shift-end time in the Zonar system.

23.     During the school year, to comply with Defendant's policies and avoid discipline, Plaintiffs arrived at their work location for their afternoon school bus run and followed established practices that required them to: park their car in the parking lot, walk to the Dispatch Office, wait in line with other Drivers, receive their bus keys from the Dispatcher, check for directives from management, talk to other employees (Drivers, Managers, Shop Stewards or Monitors) about work-related issues, walk back to their assigned bus in the parking lot, open and start the bus, check the fuel level, remove the Zonar from its storage sleeve, turn on the Zonar, wait for the Zonar to load and use the Zonar Logs function to clock-in.  Following this procedure caused Plaintiffs to arrive for their afternoon school bus run and begin working approximately 20-45 minutes before they clocked-in each day.

24.     Defendants could have easily avoided or minimized this afternoon school bus run timekeeping error by requiring Plaintiffs to clock-in upon returning to the parking lot or upon entering the building, or by allowing Plaintiffs to enter their actual afternoon shift-start time in the Zonar system.

25.     During the school year, to comply with Defendant's policies and avoid discipline, Plaintiffs completed their afternoon school bus run and followed established practices that required them to: return their bus to their work location, park their bus in the parking lot, clock-out using the Zonar Logs function, power down the Zonar, return it to the storage sleeve, perform a post-trip inspection of their bus, close their bus, walk to the Dispatch Office, wait in line with other Drivers, return their bus keys to the Dispatcher, complete and turn-in any required paperwork (including seating charts, exception sheets, incident reports, disciplinary/infraction reports, child behavior

reports and paper timesheets) and walk back to their vehicle in the parking lot and leave work for the day.  Following this procedure caused Plaintiffs to clock-out 15-40 minutes before finishing the work associated with their afternoon school bus run each day.

26.    Defendants could have easily avoided or minimized this afternoon school bus run timekeeping error by requiring Plaintiffs to clock-out upon leaving the building or upon leaving the parking lot, or by allowing Plaintiffs to enter their actual afternoon shift-end time in the Zonar system.

27.    About once a month, Defendant requires Drivers to review and update the information for each of their routes in a process called "lefts and rights."  Defendant provides Drivers with one hour's pay to complete their "lefts and rights" although, depending on the number or complexity of their routes, completing "lefts and rights" typically takes up to two hours. Defendant does not allow Drivers to create an actual, contemporaneous record of their "lefts and rights" time for payroll purposes or pay Drivers for their actual "lefts and rights" work time.

28.    About once a month, Defendant requires Drivers to attend "safety meetings" or "training meetings," which typically involve presentations on various safety-related topics. Defendant provides Drivers with one hour's pay for attending "safety meetings" or "training meetings." although, depending on the number of topics covered and other issues, these meetings typically lasted up to two hours.  Defendant does not allow Drivers to create an actual, contemporaneous record of their "safety meeting" or "training meeting" time for payroll purposes or pay Drivers for their actual "safety meeting" or "training meeting" work time.

29.    Defendant occasionally requires Drivers to perform "shop runs," which typically involve driving a bus to a mechanic's shop for repairs.  Defendant provides Drivers with one hour's pay for completing a "shop run," although, depending on distance, traffic, waiting times at the

shop and other issues, completing a "shop run" typically takes up to two hours.  Defendant does not allow Drivers to create an actual, contemporaneous record of their "shop run" time for payroll purposes or pay Drivers for their actual "shop run" work time.

30.     Defendant occasionally requires Drivers to perform "mail runs," which typically involve driving a vehicle to an office to deliver or pick-up mail.  Defendant provides Drivers with one hour's pay for completing a "mail run," although, depending on distance, traffic waiting times at the office and other issues, completing a "mail run" typically takes up to two hours.  Defendant does not allow Drivers to create an actual, contemporaneous record of their "mail run" time for payroll purposes or pay Drivers for their actual "mail run" work time.

31.     About five times per year, when schools close early for the day, Defendant requires Drivers to remain at the school after completing their morning drop-off and clock-out on the Zonar rather than returning to their work location.  On these days, Defendant's Drivers must remain off-the-clock without pay from about 8 a.m. until 10:30 a.m. despite being required to remain in their uniform, stay in close proximity to their bus, move their bus as needed (*i.e.,* to accommodate traffic) and be responsible for any damage to their bus.

32.     About two times per year, Defendant runs a "bid day" where Drivers are required to go to their work location, line up according to seniority, review the school bus routes for the upcoming school semester and pick their routes.  Depending on a Driver's seniority, "bid day" can last anywhere from one to five or six hours.  Defendant does not track the time Drivers spend on "bid day" although these activities are mandatory for all Drivers and serve Defendant's business interests by ensuring that Drivers are assigned to the school bus routes it is contractually required to run.

**Separating School Bus and Charter Work to Avoid Paying Overtime Wages**

33.    Approximately one to two times per month during the school year, Defendant's Drivers are assigned to drive a charter route.

34.    Defendant tracks Drivers' charter work separately from their school bus work, maintains separate payroll records for Drivers' charter and school bus work and provides Drivers with separate paychecks for their charter and school bus work.

35.    As a result, except in an exceptional case where a Driver records over 40 hours per week on either school bus or charter work alone, Defendant pays its Drivers at a straight-time rate for all of their charter and school bus work, even when their combined total hours exceed 40 per week.

**Facts Supporting The Named Plaintiffs' Unpaid Time Claims**

36.    During the school year, Plaintiff Stewart typically spent approximately 48 hours per week driving his assigned school bus routes and performing related, required work for which he received approximately 37 hours' worth of straight-time wages.  *See* ¶¶ 18-36, above.  Mr. Stewart typically arrived at work 15 minutes before clocking-in for his morning school bus route (75 unpaid minutes per week).  On Tuesdays and Fridays, Mr. Stewart typically clocked-out 20 minutes before leaving work for his split-shift break (40 unpaid minutes per week).  On Mondays, Wednesdays and Thursdays, Mr. Stewart cleaned his bus after completing his morning school bus route, which caused him to clock-out 60 minutes before leaving work for his split-shift break (180 unpaid minutes per week).  Mr. Stewart, who was the Rapid Response Coordinator for his location and needed time to speak with other Drivers and Management employees about work-related issues, typically arrived at work 45 minutes before clocking-in for his afternoon school bus route (225 unpaid minutes per week).  From Monday to Thursday, Mr. Stewart typically clocked-out 15

minutes before leaving work at the end of the day (60 unpaid minutes per week). On Fridays, Mr. Stewart had to complete his paperwork for the week, which typically caused him to clock-out 40 minutes before leaving work at the end of the day (40 unpaid minutes per week). As a result, including additional unpaid time spent on the activities described in paragraphs 27-32 above, Mr. Stewart spent approximately eleven hours per week, <u>including approximately three unpaid straight-time hours and eight unpaid overtime hours</u>, on work Defendant did not track and for which Defendant paid no wages.

37.     During the school year, Plaintiff Howard typically spent approximately 44 hours per week driving her assigned school bus and charter routes and performing related, required work for which she received approximately 34 hours' worth of straight-time wages. *See* ¶¶ 18-36, above. Ms. Howard typically arrived at work 30 minutes before clocking-in for her morning school bus route (150 unpaid minutes per week), clocked-out 25 minutes before leaving work for her split-shift break (125 unpaid minutes per week) and arrived at work 25 minutes before clocking-in for her afternoon school bus route (125 unpaid minutes per week). From Monday to Thursday, Ms. Howard typically clocked-out 20 minutes before leaving work at the end of the day (80 unpaid minutes per week). On Fridays, Ms. Howard had to complete her paperwork for the week, which typically caused her to clock-out 40 minutes before leaving work at the end of the day (40 unpaid minutes per week). As a result, including additional unpaid time spent on the activities described in paragraphs 27-32 above, Ms. Howard spent about ten hours per week, <u>including approximately six unpaid straight-time hours and four unpaid overtime hours</u>, on work Defendant did not track and for which Defendant paid no wages.

38.     During the school year, Plaintiff McCall typically spent approximately 45 hours per week driving his assigned school bus and charter routes and performing related, required work

for which he received approximately 35 hours' worth of straight-time wages.  *See* ¶¶ 18-36, above.
Mr. McCall typically arrived at work 30 minutes before clocking-in for his morning school bus
route (150 unpaid minutes per week), clocked-out 30 minutes before leaving work for his split-
shift break (150 unpaid minutes per week) and arrived at work 30 minutes before clocking-in for
his afternoon school bus route (150 unpaid minutes per week).  From Monday to Thursday, Mr.
McCall typically clocked-out 20 minutes before leaving work at the end of the day (80 unpaid
minutes per week).  On Fridays, Mr. McCall had to complete his paperwork for the week, which
typically caused him to clock-out 40 minutes before leaving work at the end of the day (40 unpaid
minutes per week).  As a result, including additional unpaid time spent on the activities described
in paragraphs 27-32 above, Mr. McCall spent about ten hours per week, <u>including approximately
five unpaid straight-time hours and five unpaid overtime hours</u>, on work Defendant did not track
and for which Defendant paid no wages.

39.    A few months into their employment, Plaintiffs all observed that the hours reflected
on their paychecks did not match up with the number of hours they were working.  Plaintiffs
asked their supervisors about the discrepancy between their work time and their pay and were
told things like "this is how the company works," "the same policies apply to everyone" and "we
can't do anything to change how you're paid."

40.    From time to time over the term of their employment, Plaintiffs all continued to
raise issues about how First Student tracked their time and paid for less than their actual time
worked with various supervisors, including: Barbara [Last Name Unknown] (Assistant
Supervisor), Linda [Last Name Unknown] (Dispatcher/Timekeeper/Trainer) and Margo (General
Manager) in New Jersey; Marion Chambers (Trainer), Tracy Hall (HR Manager), Brad Sprague
(General Manager) and Michelle Stanley (Supervisor) in Ohio; and Michelle Mighty (Payroll

Manager), Leah [Last Name Unknown] (Operations Manager), Robin [Last Name Unknown] (Shop Steward) and Ursula [Last Name Unknown] (General Manager) in Pennsylvania.

41.    Throughout their employment, Plaintiffs have all spoken to many other First Student Drivers about being paid for less than all of their work time.  Based on these discussions, Plaintiffs believe that the Company's failure to pay wages for all hours worked is the "number-one problem" First Student Drivers complain about and that many Drivers have left the Company because they were not being paid for all of their work.

## COLLECTIVE AND CLASS ACTION ALLEGATIONS

### FLSA Collective Action Allegations

42.    Plaintiffs bring their FLSA claims on an opt-in, collective basis pursuant to 29 U.S.C. § 216(b) for themselves and all people who have worked as a First Student Driver in any week during the maximum limitations period (the "FLSA Collective").  Plaintiffs reserve the right to amend this definition as necessary.

43.    Plaintiffs belong to the FLSA Collective they seek to represent, because they worked as First Student Drivers during the relevant period.

44.    The FLSA Collective is "similarly situated," as defined by 29 U.S.C. § 216(b), because its members performed the same job and were subjected to the same, nationwide work assignment, timekeeping and compensation policies and practices described herein.

45.    Plaintiffs and the FLSA Collective members do not meet any test for exemption under the FLSA.

46.    Based on publicly-available information on Defendant's websites, Plaintiffs believe the FLSA Collective may include more than 48,000 members.  *See https://www. firstgroupplc.com/* (accessed May 7, 2020); *https://www.firstgroupplc.com/about-firstgroup/*

*first-student.aspx* (accessed May 7, 2020).  Defendant's payroll and personnel records, among other documents, will confirm the total number of people who qualify to participate in the FLSA Collective.

**Pennsylvania / Ohio / New Jersey Class Action Allegations**

47.    Plaintiff Stewart brings his PMWA and PWPCL claims for the "Pennsylvania Class."

48.    Plaintiff Howard brings her OMFWSA and OPPA claims for the "Ohio Class."

49.    Plaintiff McCall brings his NJWHL and NJWPL claims for the "New Jersey Class."

50.    Class treatment of Plaintiff's PMWA, PWPCL, OMFWSA, OPPA, NJWHL and NJWPL claims is  appropriate because these Classes satisfy the requirements of Fed. R. Civ. P. 23.

51.    The Pennsylvania, Ohio and New Jersey Classes are so numerous that joinder of all their individual members would be impracticable.  During the relevant period, hundreds of people have worked as First Student Drivers in each of these states.

52.    Each Plaintiff's claims are typical of the claims belonging to  the members of his or her respective Class, and no Plaintiff has any interests that are antagonistic to, or in  conflict with, the interests of the members of his or her respective Class.

53.    There are many questions of law and fact common to the claims of all Pennsylvania, Ohio and New Jersey Class members because, inter alia, this action concerns the legality of the nationwide policies and practices Defendant maintained as described herein. The legality of these policies and practices will be determined by applying generally applicable legal principles to common evidence.

54.    Plaintiffs will fairly and adequately represent the interests of the Pennsylvania, Ohio and New Jersey Class members and have retained competent and experienced counsel for this purpose.

55.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact predominate over questions affecting individual plaintiffs and because a class action is superior to other available methods for the fair and efficient adjudication of these claims.

**COUNT I**
**VIOLATION OF THE FLSA**
**Unpaid Overtime Wages**
**(for the FLSA Collective)**

56.    Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

57.    Defendant is an "employer" as defined by 29 U.S.C. § 203(d).

58.    Plaintiffs and the FLSA Collective members are "employees" as defined by 29 U.S.C. § 203(e)(1).

59.    The wages Defendant pays to Plaintiffs and the FLSA Collective members are "wages" as defined by 29 U.S.C. § 203(m).

60.    Defendant is an "enterprise engaged in commerce" within the meaning of 29 U.S.C. § 203(s)(1)(A).

61.    Plaintiffs and the FLSA Collective members are similarly-situated individuals within the meaning of 29 U.S.C. § 216(b).

62.    29 U.S.C. § 216(b) expressly allows private plaintiffs to bring collective actions to enforce employers' failure to comply with the FLSA's requirements.

63.    Throughout the relevant period, Defendant has been obligated to comply with the FLSA's requirements, Plaintiffs and the FLSA Collective members have been covered employees entitled to the FLSA's protections and Plaintiffs and the FLSA Collective members have not been exempt from receiving wages required by the FLSA for any reason.

64.    29 U.S.C. § 207(a)(1) requires employers to pay their employees an overtime rate, equal to at least 1½ times their regular rate of pay, for all hours worked in excess of 40 hours per week.

65.    Defendant has intentionally violated the FLSA by maintaining common scheduling, timekeeping and compensation policies and practices that cause Defendants' Drivers to be denied overtime wage payments due for overtime work they performed with Defendant's knowledge and for Defendant's benefit.

66.    Plaintiffs and the FLSA Collective have been harmed as a direct and proximate result of Defendant's unlawful conduct because they have been deprived of overtime premium wages owed for overtime work they performed that provided Defendant with a direct and substantial benefit.

67.    By engaging in this conduct, Defendant has acted with willful and/or reckless disregard for Plaintiffs' and the FLSA Collective members' rights under the FLSA.

68.    Defendant has no good faith justification or defense for the conduct detailed herein, or for failing to pay Plaintiffs and the FLSA Collective members all wages mandated by the FLSA.

**COUNT II**
**VIOLATION OF THE PMWA**
**Unpaid Overtime Wages**
**(for the Pennsylvania Class)**

69.    Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

16

70.     Defendant is a covered employer required to comply with the PMWA's mandates.

71.     Mr. Stewart is seeking to recover "wages" as that term is defined by the PMWA.

72.     Mr. Stewart and the Pennsylvania Class members are employees entitled to the PMWA's protections and, during the relevant period, were not exempt from receiving wages payable under the PMWA for any reason.

73.     The PMWA and its enabling Regulations require employers to pay all wages owed for every hour worked and to pay overtime compensation at a rate "not less than one and one-half times an employee's regular rate" for all hours worked over 40 in a seven-day "workweek."

74.     The PMWA provides that "any agreement between the employer and the worker" is not a defense to civil actions brought to recover wages owed under the Act.

75.     During the relevant period, Defendant violated the PMWA overtime compensation requirement by knowingly suffering or permitting Mr. Stewart and the Pennsylvania Class members to perform work-related duties in week of 40 hours or more without accurately tracking this work or paying all overtime premium wages owed for it.

76.     Defendant had ample reason to know that Mr. Stewart and the Pennsylvania Class members were routinely working over 40 hours each week without receiving overtime wages for their overtime hours, because its management employees: dictated and enforced the policies and practices governing their daily activities, controlled when and how they performed their assigned tasks, controlled the order of these tasks, controlled if these tasks were performed before or after clocking-in and out each day, controlled their work schedules, controlled how time was tracked for work relating to "lefts and rights," "safety meetings," "training meetings," "shop runs," "mail runs," early school closing work and "bid days" and how wages were paid for these activities, had contemporaneous access to their time records through the Zonar system, controlled how wages

were paid for their work and received regular complaints about discrepancies between the number of hours they worked and the number of hours for which they were paid.

77.    Defendant's failure to pay Mr. Stewart and the Pennsylvania Class members overtime premium wages owed for all of the overtime hours they actually worked violated the PMWA and caused them to suffer economic harm.

78.    During the relevant period, there was no language in the PMWA, no exception to the PMWA, or any applicable provision elsewhere in Pennsylvania law that permitted Defendant to avoid paying all overtime premium wages owed for all overtime hours Mr. Stewart and the Pennsylvania Class members worked.  As a result, Defendant had no good faith justification or defense for failing to pay the overtime premium wages sought by this claim.

**COUNT III**
**VIOLATION OF THE PWPCL**
**Unpaid Straight-Time and Overtime Wages**
**(for the Pennsylvania Class)**

79.    Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

80.    Defendant is a covered employer required to comply with the PWPCL's mandates.

81.    Mr. Stewart is seeking to recover "wages" as that term is defined by the PWPCL.

82.    Mr. Stewart and the Pennsylvania Class members are employees entitled to the PWPCL's protections and, during the relevant period, were not exempt from receiving wages payable under the PWPCL for any reason.

83.    The PWPCL requires employers to pay all regular and overtime premium wages due to their employees on regular paydays designated in advance.

84.    The PWPCL gives employees the right to enforce any legal right to wages due, including the statutory right to overtime pay conferred by the PMWA, and its application is not

limited only to claims arising from a written contract.

85.    During the relevant period, Defendant violated the PWPCL wage payment requirement by knowingly suffering or permitting Mr. Stewart and the Pennsylvania Class members to perform work-related duties without requiring accurately tracking this work or paying all regular and overtime premium wages owed for it.

86.    Defendant had ample reason to know that Mr. Stewart and the Pennsylvania Class members were routinely performing off-the-clock straight-time and overtime work, because its management employees: dictated and enforced the policies and practices governing their daily activities, controlled when and how they performed their assigned tasks, controlled the order of these tasks, controlled if these tasks were performed before or after clocking-in and out each day, controlled their work schedules, controlled how time was tracked for work relating to "lefts and rights," "safety meetings," "training meetings," "shop runs," "mail runs," early school closing work and "bid days" and how wages were paid for these activities, had contemporaneous access to their time records through the Zonar system, controlled how wages were paid for their work and received regular complaints about discrepancies between the number of hours they worked and the number of hours for which they were paid.

87.    Defendant's failure to pay Mr. Stewart and the Pennsylvania Class members all regular and overtime premium wages owed for all of the hours they actually worked violated the PWPCL and caused them to suffer economic harm.

88.    During the relevant period, there was no language in the PWPCL, no exception to the PWPCL, or any applicable provision elsewhere in Pennsylvania law that permitted Defendant to avoid paying all wages owed for all hours Mr. Stewart and the Pennsylvania Class members worked.  As a result, Defendant had no good faith justification or defense for failing to pay the

wages sought by this claim.

**COUNT IV**
**VIOLATION OF THE OMFWSA**
**Unpaid Overtime Wages**
**<u>(for the Ohio Class)</u>**

89.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

90.     Defendant is a covered employer required to comply with the OMFWSA's mandates.

91.     Ms. Howard is seeking to recover "wages" as that term is defined by the OMFWSA.

92.     Ms. Howard and the Ohio Class members are employees entitled to the OMFWSA's protections and, during the relevant period, were not exempt from receiving wages payable under the OMFWSA for any reason.

93.     The OMFWSA requires employers to pay overtime "at a wage rate of one and one-half times the employee's wage rate for hours worked in excess of forty hours in one workweek."

94.     During the relevant period, Defendant violated the OMFWSA overtime compensation requirement by knowingly suffering or permitting Ms. Howard and the Ohio Class members to perform work-related duties in week of 40 hours or more without accurately tracking this work or paying all overtime premium wages owed for it.

95.     Defendant had ample reason to know that Ms. Howard and the Ohio Class members were routinely working over 40 hours each week without receiving overtime wages for their overtime hours, because its management employees: dictated and enforced the policies and practices governing their daily activities, controlled when and how they performed their assigned tasks, controlled the order of these tasks, controlled if these tasks were performed before or after clocking-in and out each day, controlled their work schedules, controlled how time was tracked

20

for work relating to "lefts and rights," "safety meetings," "training meetings," "shop runs," "mail runs," early school closing work and "bid days" and how wages were paid for these activities, had contemporaneous access to their time records through the Zonar system, controlled how wages were paid for their work and received regular complaints about discrepancies between the number of hours they worked and the number of hours for which they were paid.

96.     Defendant's failure to pay Ms. Howard and the Ohio Class members overtime premium wages owed for all of the overtime hours they actually worked violated the OMFWSA and caused them to suffer economic harm.

97.     During the relevant period, there was no language in the OMFWSA, no exception to the OMFWSA, or any applicable provision elsewhere in Ohio law that permitted Defendant to avoid paying all overtime premium wages owed for all overtime hours Ms. Howard and the Ohio Class members worked.  As a result, Defendant had no good faith justification or defense for failing to pay the overtime premium wages sought by this claim.

## COUNT V
## VIOLATION OF THE OPPA
### Failure to Timely Pay Straight-Time and Overtime Wages
### (for the Ohio Class)

98.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

99.     Defendant is a covered employer required to comply with the OPPA's mandates.

100.    Ms. Howard is seeking to recover "wages" as that term is defined by the OPPA.

101.    Ms. Howard and the Ohio Class members are employees entitled to the OPPA's protections and, during the relevant period, were not exempt from receiving wages payable under the OPPA for any reason.

102.     The OPPA provides that: "Every employer doing business in this state shall, on or before the first day of each month, pay all its employees the wages earned by them during the first half of the preceding month ending with the fifteenth day thereof, and shall, on or before the fifteenth day of each month, pay such employees the wages earned by them during the last half of the preceding calendar month."

103.     During the relevant period, Defendant violated the OPPA wage payment requirement by failing to timely pay Ms. Howard and the Ohio Class members all regular and overtime premium wages owed for the work they performed.

104.     Defendant had ample reason to know that Ms. Howard and the Ohio Class members were routinely performing unpaid off-the-clock straight-time and overtime work, because its management employees: dictated and enforced the policies and practices governing their daily activities, controlled when and how they performed their assigned tasks, controlled the order of these tasks, controlled if these tasks were performed before or after clocking-in and out each day, controlled their work schedules, controlled how time was tracked for work relating to "lefts and rights," "safety meetings," "training meetings," "shop runs," "mail runs," early school closing work and "bid days" and how wages were paid for these activities, had contemporaneous access to their time records through the Zonar system, controlled how wages were paid for their work and received regular complaints about discrepancies between the number of hours they worked and the number of hours for which they were paid.

105.     Defendant's failure to timely pay Ms. Howard and the Ohio Class members all regular and overtime premium wages owed for all of the hours they actually worked violated the OPPA and caused them to suffer economic harm.

106.    During the relevant period, there was no language in the OPPA, no exception to the OPPA, or any applicable provision elsewhere in Ohio law that permitted Defendant to avoid timely paying all wages owed for all hours Ms. Howard and the Ohio Class members worked.  As a result, Defendant had no good faith justification or defense for failing to timely pay the wages sought by this claim.

**COUNT VI**
**VIOLATION OF THE NJWHL**
**Unpaid Overtime Wages**
**<u>(for the New Jersey Class)</u>**

107.    Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

108.    Defendant is a covered employer required to comply with the NJWHL's mandates.

109.    Mr. McCall is seeking to recover "wages" as that term is defined by the NJWHL.

110.    Mr. McCall and the New Jersey Class members are employees entitled to the NJWHL's protections and, during the relevant period, were not exempt from receiving wages payable under the NJWHL for any reason.

111.    The NJWHL and its enabling Regulations require employers to pay all wages owed for every hour worked and to pay overtime compensation at a rate "not less than 1½ times such employee's regular hourly wage for each hour of working time in excess of 40 hours in any week.

112.    The NJWHL provides that provides that an agreement between the employer and employee to work for less than the wages required by the Act is not a defense to an action seeking to recover those unpaid wages.

113.    During the relevant period, Defendant violated the NJWHL overtime compensation requirement by knowingly suffering or permitting Mr. McCall and the New Jersey Class members to perform work-related duties in week of 40 hours or more without accurately tracking this work

or paying all overtime premium wages owed for it.

114.    Defendant had ample reason to know that Mr. McCall and the New Jersey Class members were routinely working over 40 hours each week without receiving overtime wages for their overtime hours, because its management employees: dictated and enforced the policies and practices governing their daily activities, controlled when and how they performed their assigned tasks, controlled the order of these tasks, controlled if these tasks were performed before or after clocking-in and out each day, controlled their work schedules, controlled how time was tracked for work relating to "lefts and rights," "safety meetings," "training meetings," "shop runs," "mail runs," early school closing work and "bid days" and how wages were paid for these activities, had contemporaneous access to their time records through the Zonar system, controlled how wages were paid for their work and received regular complaints about discrepancies between the number of hours they worked and the number of hours for which they were paid.

115.    Defendant's failure to pay Mr. McCall and the New Jersey Class members overtime premium wages owed for all of the overtime hours they actually worked violated the NJWHL and caused them to suffer economic harm.

116.    During the relevant period, there was no language in the NJWHL, no exception to the NJWHL, or any applicable provision elsewhere in New Jersey law that permitted Defendant to avoid paying all overtime premium wages owed for all overtime hours Mr. McCall and the New Jersey Class members worked.  As a result, Defendant had no good faith justification or defense for failing to pay the overtime premium wages sought by this claim.

**COUNT VII**
**VIOLATION OF THE NJWPL**
**Unpaid Straight-Time and Overtime Wages**
**(for the New Jersey Class)**

117.    Each of the preceding paragraphs is incorporated by reference as though fully set

forth herein.

118.    Defendant is a covered employer required to comply with the NJWPL's mandates.

119.    Mr. McCall is seeking to recover "wages" as that term is defined by the NJWPL.

120.    Mr. McCall and the New Jersey Class members are employees entitled to the NJWPL's protections and, during the relevant period, were not exempt from receiving wages payable under the NJWPL for any reason.

121.    The NJWPL requires employers to pay all regular and overtime premium wages due to their employees on regular paydays designated in advance.

122.    The NJWPL gives employees the right to enforce any legal right to wages due, including the statutory right to overtime pay conferred by the NJWHL, and its application is not limited only to claims arising from a written contract.

123.    During the relevant period, Defendant violated the NJWPL wage payment requirement by knowingly suffering or permitting Mr. McCall and the New Jersey Class members to perform work-related duties without requiring accurately tracking this work or paying all regular and overtime premium wages owed for it.

124.    Defendant had ample reason to know that Mr. McCall and the New Jersey Class members were routinely performing off-the-clock straight-time and overtime work, because its management employees: dictated and enforced the policies and practices governing their daily activities, controlled when and how they performed their assigned tasks, controlled the order of these tasks, controlled if these tasks were performed before or after clocking-in and out each day, controlled their work schedules, controlled how time was tracked for work relating to "lefts and rights," "safety meetings," "training meetings," "shop runs," "mail runs," early school closing work and "bid days" and how wages were paid for these activities, had contemporaneous access

to their time records through the Zonar system, controlled how wages were paid for their work and received regular complaints about discrepancies between the number of hours they worked and the number of hours for which they were paid.

125.    Defendant's failure to pay Mr. McCall and the New Jersey Class members all regular and overtime premium wages owed for all of the hours they actually worked violated the NJWPL and caused them to suffer economic harm.

126.    During the relevant period, there was no language in the NJWPL, no exception to the NJWPL, or any applicable provision elsewhere in New Jersey law that permitted Defendant to avoid paying all wages owed for all hours Mr. McCall and the New Jersey Class members worked. As a result, Defendant had no good faith justification or defense for failing to pay the wages sought by this claim.

WHEREFORE, Plaintiffs respectfully pray for an Order:

    a.    Certifying this matter to proceed as a collective action with respect to Count I;

    b.    Certifying this matter to proceed as a class action with respect to Counts II-VII;

    c.    Finding Defendant willfully violated the applicable provisions of the FLSA, PMWA, PWPCL, OMFWSA, OPPA, NJWHL and NJWPL by failing to pay all required overtime wages to Plaintiffs, the FLSA Collective members and the Pennsylvania, Ohio and New Jersey Class members;

    d.    Granting judgment in favor of Plaintiffs and the FLSA Collective against Defendant on Count I;

    e.    Granting judgment in favor of Plaintiffs and the Pennsylvania Class members against Defendant on Counts II and III;

    f.    Granting judgment in favor of Plaintiffs and the Ohio Class members against Defendant on Counts IV and V;

    g.    Granting judgment in favor of Plaintiffs and the New Jersey Class members against Defendant on Counts VI and VII;

h.  Awarding all available compensatory damages in amounts to be determined;

i.  Awarding all available liquidated damages in amounts to be determined;

j.  Awarding pre-judgment interest on all compensatory damages due;

k.  Awarding a reasonable attorney's fee and reimbursement of all costs and expenses incurred in litigating this action;

l.  Awarding equitable and injunctive relief precluding the continuation of the policies and practices pled in this Complaint;

m.  Awarding any further relief the Court deems just, necessary, and proper; and

n.  Maintaining jurisdiction over this action to ensure Defendant's compliance with the foregoing.

## JURY DEMAND

Plaintiffs demand a jury trial as to all claims so triable.

Respectfully Submitted,

Dated: May 31, 2020            */s/ David J. Cohen*
David J. Cohen
STEPHAN ZOURAS LLP
604 Spruce Street
Philadelphia, PA 19106
(215) 873-4836
dcohen@stephanzouras.com

James B. Zouras
STEPHAN ZOURAS, LLP
100 N. Riverside Plaza, Suite 2150
Chicago, IL  60606
312-233-1550
jzouras@stephanzouras.com

*Attorneys for Plaintiffs and the*
*Putative FLSA Collective*